*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *Criminal No. 05-70-P-S* |
| | ) | |
| *GARY BROWN,* | ) | |
| | ) | |
| *Defendant* | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Gary Brown, charged in an indictment with possession with intent to distribute 50 grams or more of a substance containing cocaine base in violation of 21 U.S.C. § 841(a)(1), moves to suppress any and all evidence seized and statements made on July 29, 2005 and thereafter. Indictment (Docket No. 1); Motion to Suppress, etc. ("Motion") (Docket No. 15) at 1.[1] An evidentiary hearing was held before me on January 13, 2006, at which the defendant appeared with counsel. Counsel for the defendant argued orally at the end of the hearing; counsel for the government declined an opportunity to do so. I recommend that the following findings of fact be adopted and that the motion to suppress be denied.

### I. Proposed Findings of Fact

Kevin Cashman, a Lewiston police officer assigned to the Maine Drug Enforcement Agency, received information on July 7, 2005 from a confidential informant who had been providing information to law enforcement personnel for less than a week but who had already provided reliable

---

[1] The motion was filed by the defendant's first counsel of record. His current counsel of record filed a "Supplemental Memorandum of Law in Support of Motion for Suppression," which includes several new arguments in support of the defendant's position, on the day before the scheduled hearing. Docket No. 32. Counsel is reminded that the filing of such a supplemental memorandum requires prior (*continued on next page*)

information and whose knowledge of drug trafficking in the Portland area included sellers, transporters and users of whom Cashman was already aware. The confidential informant had a record of violation of a protection order in the 1990s, convictions for burglary and theft in the 1970s and for escape as a juvenile, and was facing state drug charges. No promises or payments were made in exchange for the furnished information but the confidential informant expected that his cooperation would be reported to the district attorney.

The confidential informant told Cashman that a black male traveled to Maine from New York City at least once a week to "move" between ten and twenty ounces of crack and powder cocaine. The confidential informant said that this man was known as "Pink" and usually stayed in a hotel in the area around the former Exit 8 of the Maine Turnpike in a room rented under the name of David Tanguay or Peter Tanguay. The confidential informant said that David Tanguay was in federal prison and Peter Tanguay would use David Tanguay's identification to rent the room. The confidential informant said that Pink was currently in a hotel at Exit 8. The confidential informant told Cashman that he had seen Pink twice but had never spoken with him; he gave Cashman no physical description of Pink other than the indication he was black. He said that Pink would bring large quantities of drugs to Maine which he would deliver to smaller dealers.

Cashman and Agent Brian Letarte proceeded to check hotels in the Exit 8 area. They went first to the Ramada, where they found that Room 127 had been rented in the name of David Tanguay. The desk clerk gave them copies of the hotel registration form and the identification card used to rent the room. The Maine identification card was signed by David Tanguay. That signature was markedly different from the "David Tanguay" signature on the hotel registration form. The agents obtained a room diagonally across the hall from Room 127 and conducted surveillance of Room 127 by looking

---

leave of court. At the outset of the evidentiary hearing held last Friday, the government acknowledged its receipt and review of the (*continued on next page*)

out through the peephole in the door of their room.  Cashman called the Portland Police Department from the room and spoke with dispatcher Kathy Grant who confirmed that a David Tanguay, with the same date of birth as that given on the identification card, was then incarcerated in Massachusetts. After about two hours of the surveillance, Agent Erik Larsen from South Portland brought a monocular device to the room, which allowed the agents to look down the hallway from under the door of their room.

Around 10 p.m. a black male and a while male entered Room 127; the white male left after about two minutes.  The agents had no idea whether the white male was carrying drugs when he left. Later, the black male left for a few minutes and returned alone.  He stayed in Room 127 until the agents left.  The agents were unable to identify the black male due to limitations of the monocular device.

On July 29, 2005 the same confidential informant called Cashman and told him that Pink was on a Vermont Transit bus from New York City to Portland, where he would be picked up by Peter Tanguay at the bus station in the early afternoon.  He said that Peter Tanguay would be using the confidential informant's vehicle, an old-style green pickup truck for which the confidential informant also gave Cashman the license plate number.  He also said that Pink was bringing to Maine the usual amount of cocaine.

Cashman contacted Larsen and asked him to meet the confidential informant in Windham. Larsen subsequently told Cashman that he met the confidential informant in Windham, where he searched the confidential informant and his truck and found no contraband; that they then went to Gray, where they picked up Peter Tanguay, and drove back toward Windham and that they dropped Tanguay off at a residence in Windham so that a third party would not know that Tanguay was meeting Pink.

---

supplemental memorandum.  In the absence of any objection, the supplemental memorandum is accepted for filing.

Larsen reported to Cashman that he later saw two people in the truck, one of whom was the confidential informant who was operating the vehicle and who had told Larsen that they would be driving to an address on Valley Street in Portland.  Larsen along with other agents followed the truck to that address, where both occupants got out and went into a residence at around 12:15 p.m.  At 1:30 p.m. the other earlier occupant of the truck drove off in the truck.  Agent Letarte identified this person as Peter Tanguay, with whom he had grown up, and communicated his identification via radio.  The truck went to a residence and a gas station in Windham, then reached Union Station Plaza in Portland around 2:40 p.m.

At the Plaza, Tanguay left the truck and went into a discount grocery store.  When he returned to the truck, he drove down the street to the parking lot of the Vermont Transit bus station, where he parked and remained in the vehicle.[2]  Calloway and McCusker, who were in plain clothes, then got out of their vehicle and walked over to the bus station, where they mingled with ten to fifteen people who were waiting for the bus.  When the bus, which had come from New York City via Boston, pulled into the station at 3:20 p.m., it parked with its door facing Cashman, Letarte and the truck driven by Tanguay.  One black male got off the bus and turned left, away from the truck and toward a taxi stand.  The next black male who got off the bus was carrying two duffel bags, one black and one blue; he walked directly to the truck, opened the passenger door, put the bags in the cab of the truck, then got in and closed the door.  The truck pulled out onto St. John Street.

Cashman had arranged to have two marked Portland Police Department cruisers pull the truck over.  Officer Robert Bickford did so at 3:26 p.m., a short distance down St. John Street. Other agents

---

[2] On Government Exhibit 1, which is an enlarged aerial photograph of the area around the Vermont Transit bus station in Portland, the number 1 indicates the terminal; 2 is where Cashman was positioned before the bus arrived; 3 is where Agent Jeffrey Calloway was located; 4 is where Portland Police Officer Eric McCusker was located; 5 is where Letarte was located; 6 is where Tanguay parked the truck; 7 is where the bus stopped when it pulled in; and 8 is where Calloway and McCusker parked.  Larsen was conducting "rolling surveillance," driving back and forth on St. John Street, which is next to the bus station, and Agent Scott Durst was parked (*continued on next page*)

and officers pulled up in front of and behind the truck.  Bickford went to the passenger side of the truck and got the black male passenger out.  Officer Nguyen and Sergeant Sawshuck were also on the scene. Bickford saw two duffel bags on the bench seat between the passenger and the driver.  Bickford did a patdown search of the passenger and asked for his name and date of birth.  The passenger said that his name was Anthony Green; he gave a date of birth and said that he lived in the Dorchester area of Boston.  Bickford ran that name and date of birth on the computer in his cruiser and was unable to find any information about such an individual, so he went back to the passenger and asked for his Social Security number, which the passenger stated he did not know.  Bickford thought that the passenger was lying and was looking for an avenue of escape.  He told Sergeant Pelletier, who was standing with the passenger, that the personal information the passenger had given him was not on file.

Pelletier then took Bickford's notebook and asked the passenger again for his identification information.  Bickford saw the passenger look down at the notebook, as if trying to remember the name that he had given, before stating again that his name was Anthony Green.  From the time of the traffic stop until he was taken to the Cumberland County Jail, the passenger appeared nervous, frequently looking around him.

When Cashman reached the truck, he asked the driver who the bags on the seat belonged to; the driver said that they were his.  Cashman then walked over to the passenger, arriving just after Pelletier had  asked the passenger for his name and date of birth, and asked the passenger about the bags.  The passenger said that he did not know who owned the bags and that they had been in the truck when he got in.  Cashman asked the passenger for his name and date of birth and the passenger said that his name was Anthony Green and that he had been born in 1973.  Cashman testified that it was clear that the passenger was older than that.  The passenger claimed he had no identification and produced none.

---

around the corner near Congress Street in case the truck drove away in that direction.

When Cashman asked him how to spell his name, the passenger hesitated and then said, "Like the color."

Before the bus arrived, Cashman had called the Portland Police Department to request that a K-9 unit be sent to the scene.  When he was told that none was available, he called the state police and learned that their closest dog was an hour away.  He then called the Portland Police Department again and asked that they call around to other towns to find out whether a dog was available; none was. Sergeant Sawshuck then arranged to have one of the Portland Police Department's dogs called in for duty; Officer Benjamin Noyes, a certified dog handler for the Portland Police Department since July 2001, was called at home and told to report to the scene with his dog, Justice.  Justice was certified for narcotics detection in November 2003 and he and Noyes receive narcotics training every Monday for four hours.

Noyes and Justice arrived about a half hour after the stop; the truck was not searched while the officers and agents were waiting.  During the wait, Cashman told the passenger that he knew that the passenger was lying.  The passenger then said that the blue bag was his but the black bag was not. When Noyes and Justice arrived, Cashman briefed Noyes and asked him to do a search of the truck as he and Justice usually did it.  Noyes commanded Justice to begin, but he immediately noticed that the dog seemed distracted.  Noyes knew that this behavior meant that the dog needed to relieve himself, so he took the dog to a nearby grassy area where the dog did so, whereupon Noyes and the dog began the search again.  Justice performed thereafter as he always does during a vehicle search.  At the passenger door, Justice started wagging his tail excitedly, performed a deep nasal exchange and a head snap and then went to a sitting position, which is an indication of the strongest point of the scent to which he is reacting.  Noyes rewarded Justice, then opened to door of the truck cab and commanded him to begin.

6

Justice went directly to the black bag, put his nose into the bag and went immediately into a sit. This indicated the presence of the odor of narcotics in the bag. Noyes removed the bag from the truck and handed it to Cashman, who he advised that Justice had indicated on the bag. Noyes noted a white powder residue in the open glove box of the truck, which he closed in order to protect Justice. He then commanded Justice to search again. The dog sniffed along the headliner of the cab, then worked along the dashboard and indicated on the blue bag by sitting. Noyes removed the bag and handed it to Cashman. Commanded to search again, Justice alerted on the glove box. Noyes then put the dog back in Noyes's vehicle, returned to the truck, opened the glove box and found a small plastic baggie containing a small amount of white powder. This is typically the way in which cocaine is carried. Larsen field tested this powder, which was positive for cocaine.

Cashman searched the black bag on the sidewalk. He found a brown paper bag full of smaller bags, each of which contained what he suspected to be marijuana, a bag full of male clothing and shoes, and at the bottom a large toiletry kit holding four baggies stuffed with what he suspected was cocaine, an open box of sandwich bags which he testified are often used as packaging material for drugs and a scale with white residue. Each of the front pockets of a pair of jeans in the bag contained a baggie, one containing what Cashman believed to be crack cocaine and the other containing what he believed to be powder cocaine. Cashman also searched the blue bag, in which he found four cell phones but no drugs. Cashman knows that drug traffickers typically use several cell phones, restricting each to certain types of calls. The contraband field tested positive for cocaine; there was 340 grams of crack cocaine in the black bag, with a street value of nearly $75,000. Government Exhibit 2 is a photograph of the powder cocaine and crack cocaine seized from the black bag. At this point in the stop, Cashman asked the Portland officers to arrest both occupants of the truck.

Bickford transported the passenger to the Cumberland County Jail.  When they got to the jail, Bickford told the passenger that there was an expert on identification working in the intake area.  The passenger then gave Bickford his real name, Gary Brown, his correct date of birth (in 1964), his address and his Social Security number.

The defendant presented the testimony of his girlfriend, Cynthia Marks, and his mother, Dorothy Brown, both of whom testified that from July 2 to July 26, 2005, the defendant was with them in the Bronx, New York, and was not away from them for more than a few hours at any time.

## II.  Discussion

The defendant contends that there was no probable cause to detain or arrest him.  Motion at 3. This is so, he asserts, because both Peter Tanguay and the defendant claimed ownership of the blue duffel bag, and the officers arrested him "without resolving the issue of the disputed ownership of the bag;" because he was arrested "[d]espite [the officers'] finding suspected cocaine in the glove box of Tanguay's vehicle[] and despite Tanguay's admission that the bags belonged to him."  *Id.* at 4.  This argument ignores the fact that several of the officers had seen the defendant get off the bus with both the blue and the black bags and place them in the cab of the truck.  It is not necessary to address much of the defendant's argument, however, because, as the government points out, Government's Objection to Defendant's Motion to Suppress Evidence, etc. ("Opposition") (Docket No. 19) at 5, the defendant lacks standing to challenge the search of the truck and the search of the black duffel bag.

The search of the truck and the bag would not have taken place without the stop of the truck. While the defendant's initial motion cannot reasonably be read to challenge the stop,  the defendant's supplemental memorandum clearly asserts that the officers lacked probable cause to stop the truck. Supplemental Memorandum of Law in Support of Motion for Suppression ("Supplemental Motion") (Docket No. 32) at 2-3.  The defendant contends that the information from the confidential informant

"bears no indicia of reliability." *Id*. at 2. To the contrary, Cashman testified that the confidential informant had previously provided information which proved to be reliable. Counsel for the defendant made much at oral argument of the fact that the agents "found no evidence of any wrongdoing" during their surveillance at the Ramada Inn on July 7, 2005 and that the defendant's girlfriend and mother both testified that he was with them in the Bronx on that date, but the agents were able to confirm the confidential informant's statement that a black male was registered as "David Tanguay," that the identification card of a David Tanguay who was in prison had been used to register for the room and that it was likely that someone other than the David Tanguay who signed the identification card had signed the hotel register. Cashman could not say whether the black male he observed coming and going from the room was the defendant. This fact alone does not make the confidential informant's information unreliable. *See United States v. Diallo*, 29 F.3d 23, 26 (1st Cir. 1994) (inconsistencies between informant's tip and reality not of such importance that information must be concluded to be incorrect; enough that prudent law enforcement officer would reasonably conclude that likelihood existed that criminal activities afoot and defendant probably engaged in them). Even if the testimony of the defendant's girlfriend and mother is credited, the information provided by the confidential informant on July 29, 2005 was all verified up to the time the stop was made. Peter Tanguay did borrow the confidential informant's truck and park it at the bus station, where a black male carrying two duffel bags got off the bus that was scheduled to arrive at 3:05 p.m. and went straight to the truck. The confidential informant's information had sufficient indicia of reliability. *See Terry v. Ohio*, 392 U.S. 1, 26-27 (1968); *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001) (traffic stop must be supported by reasonable and articulable suspicion of criminal activity; reasonable suspicion does not require probable cause). The defendant's challenge of the traffic stop must fail.

The defendant next contends that the alert of Justice to the black bag is insufficient to provide probable cause to search the contents of the bag because "'Justice' was concededly 'not searching properly'" prior to the alert.  Supplemental Motion at 5.  The defendant lacks standing to raise this argument inasmuch as he, at all times before the black bag was searched, denied ownership of it.  To the extent that the defendant's argument extends to the search of the truck by Justice, the officers knew that the defendant did not own the truck in which he was riding.  An individual who lacks a reasonable expectation of privacy in a place or object lacks standing to object to the search of that place or object.  *United States v. Edwards*, 242 F.3d 928, 936 (10th Cir. 2001) (defendant not authorized driver of searched rental car); *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994) (defendant who disclaimed ownership of bags forfeits any right of privacy in bags); *United States v. De Los Santos Ferrer*, 999 F.2d 7, 9 (1st Cir. 1993) (disclaimer of ownership of luggage justified warrantless search).

Even if the defendant had standing to challenge the search of the truck or the black bag, that challenge would fail.  A canine sniff of the outside of a vehicle does not constitute a search within the meaning of the Fourth Amendment.  *United States v. Rodriguez-Morales*, 929 F.2d 780, 788 (1st Cir. 1991).  Once Justice had "alerted" on the outside of the truck, the officers had probable cause to put Justice into the cab of the truck.  Once he "alerted" on the black duffel bag, they had probable cause to open and search it.  *See United States v. Lopez*, 380 F.3d 538, 543-44 (1st Cir. 2004) (drug dog's aggressive alert in front of van provides probable cause to search the van); *United States v. Owens*, 167 F.3d 739, 749 (1st Cir. 1999) (existence of probable cause based on alert of drug dog depends on dog's reliability).[3]

---

[3] I discuss Justice's reliability in the next paragraph.

If the defendant means also to challenge the search of the blue duffel bag, in which he eventually did claim an ownership interest, it is true that no drugs were found in the blue bag. However, neither this fact nor the fact that Justice was "not searching properly" before he was allowed to relieve himself[4] entitles the defendant to suppression of the fruits of this search. Counsel for the defendant characterizes the time when Justice was "not searching properly" as "initial non-alerts." Supplemental Motion at 6. However, that characterization is not supported by the testimony. Justice's handler testified that the term "not searching properly" which apparently was used in his report of the stop and search at issue here referred only to a period of less than a minute after Justice was first commanded to search, when Justice seemed distracted and his handler realized that he needed to relieve himself. Thereafter, the testimony is that Justice performed a "textbook" search. The alert on the blue bag is explained by its close proximity to the black bag, which contained a large amount of cocaine. Even if Justice had not "alerted" on the blue bag, the defendant was seen carrying it out of the bus, cocaine was found in the black bag which the defendant was also seen carrying out of the bus, and it was very likely that the blue bag would eventually have been searched, particularly given the defendant's arrest and his later admission that he had given a false name and date of birth at the time of the traffic stop. Because the contents of the blue bag would inevitably have been discovered, suppression is not available. *See United States v. Almeida*, __ F.3d __, 2006 WL 51406 (1st Cir. 2006), at *2-*4.

Finally, the defendant contends that the officers lacked probable cause to arrest him because they lacked reasonably trustworthy information that would lead a prudent person to believe that he had committed or was committing a criminal offense. Motion at 3-4. Indeed, the officers had such

---

[4] The defendant contends that Justice "falsely 'alerted' . . . to a white powder in the vehicle's glove compartment (which tested negative for cocaine)." Supplemental Motion at 5. The undisputed testimony of Cashman at the evidentiary hearing was that the substance from the glove compartment field tested positive for cocaine.

information.  Contrary to the defendant's suggestion, they were not required to determine whether the blue bag actually belonged to the defendant or to Tanguay or whether the defendant owned the cocaine in the glove compartment before they could arrest the defendant.  *Maryland v. Pringle*, 540 U.S. 366, 373 (2003) (upholding arrest of passenger in car in which a large amount of cocaine was found; reasonable for officer to infer common enterprise among occupants).

The defendant's motion refers in passing to "all statements and/or confessions, written or verbal, obtained from him by any law enforcement officials," Motion at 1, but no evidence of any confessions or written statements was offered at the hearing.  To the extent that the defendant means to refer to his giving a false name and date of birth to the officers, the motion lacks merit.  *See Pennsylvania v. Muniz*, 496 U.S. 582, 600-02 (1990) (questions regarding name, address, height, weight, eye color, date of birth and current age do not constitute custodial interrogation requiring warning under *Miranda v. Arizona*, 384 U.S. 436 (1966)).

### III.  Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact be adopted and that defendant's motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 17th day of January, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge